# CIRCUIT COURT OF ARLINGTON COUNTY

US Airways, Inc., et al.

v.

Commonwealth Ins. Co. et al.

May 14, 2004

Case No. (Law) 03-587

BY JUDGE JOANNE F. ALPER

This matter comes before the Court on Defendant PMA Capital Insurance Corporation's Motion for Summary Judgment and US Airways' Cross-Motion for Partial Summary Judgment. Having heard the arguments of counsel, examined the briefs prepared by the parties, and taken this matter under advisement, the Court issues the following ruling.

## I. *Statement of the Case*

US Airways Group, Inc. ("US Airways") entered into a property insurance contract with Caliber One Indemnity Company that provided coverage for the period of December 1, 2000, through December 1, 2001.[1] Defendant

---

[1] The policy also covers four subsidiaries of US Airways, Allegheny Airlines, Inc., Piedmont Airlines, Inc., PSA Airlines, Inc., and MidAtlantic Airways, Inc., all of whom are plaintiffs in this matter. This Court entered an order allowing Plaintiff US Airways leave to amend its

PMA Capital Insurance Corporation ("PMA") became a party to this action as a successor in interest to Caliber One Indemnity Company.

The policy in question is an All Risk Manuscript Property Policy ("the Policy") which covers damage to property, including business interruption, up to a limit of $25 million.[2] The Policy is a subscription policy where several insurance providers jointly agreed to underwrite a percentage of the coverage. The present case involves only one of the insurance providers, PMA.[3]

The relevant sections of the Policy are:

### 7. *Coverage*

#### B. *Business Interruption*

1. Loss resulting from necessary interruption of business conducted by the Insured and caused by loss, damage, or destruction to real or personal property by any of the perils covered herein during the term of this policy. . . .

5. Resumption of Operations: It is a condition of this insurance that, if the Insured could reduce the loss resulting from the interruption of business: (a) by a complete or partial resumption of operation of the property insured, whether damaged or not. . . .

#### F. *Provision Applicable to Business Interruption.* . . .

5. Interruption by Civil or Military Authority: This policy extended to cover the loss sustained during the period of time, not to exceed 30 consecutive days, when, as a direct result of a peril insured against, access to real or personal property is prohibited by order of civil or military authority.

### 8. *Perils Insured Against*

This policy insures against all risk of direct physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded. . . .

---

Motion for Judgment on November 17, 2003, to include US Airways' subsidiaries as named plaintiffs.

[2] Coverage under the policy includes damage to real and personal property, business interruption, extra expenses incurred from loss to property, rental value/rental income lost due to damage to property, royalties lost, damage to property in transit, loss caused by damage to records of accounts receivable, and damages to leasehold interests. (Policy §§ 7(A)-(I).)

[3] This Court entered an agreed order dismissing the claims of US Airways et al. against the other Defendants on February 26, 2004.

9. *Perils Excluded*

This policy does not insure. . . .

E. Against loss of market, except as provided for elsewhere in this policy.

24. *Salvage and Recoveries*

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this policy, shall reduce the loss accordingly. If recovered or received subsequent to a loss settlement under this policy, such net amounts recovered shall be divided between the interests concerned, *i.e.*, the Insured and any other Company(ies) participating in the payment of any loss, in the proportion of their respective interests.

On September 11, 2001, terrorist attacks on the United States caused the Federal government to enact extraordinary measures to protect the public. The use of commercial aircraft during the attacks on the World Trade Center and the Pentagon caused the Federal Aviation Administration to issue a ground halt order, which mandated that all aircraft in the air land immediately, prohibited any flights from departing, and forbade any international flights from entering United States airspace. FDC #1/9731 (Notice to Airmen, September 11, 2001).

The Federal government also ordered the immediate closure of Reagan National Airport.[4] The airport remained closed until October 4, 2001, when commercial operations resumed.[5]

The Federal government's closure of Reagan National Airport in response to the attacks of September 11th is the basis for US Airways' claimed losses due to business interruption under the policy with PMA. Based upon the express terms of the Policy, PMA seeks summary judgment dismissing US Airways' claims. US Airways seeks summary judgment on two of PMA's defenses as a matter of law.

---

[4] US Airways is based in Arlington County and is the largest commercial operator at Reagan National Airport.

[5] Press Release, Office of the Press Secretary, The White House, *Opening of Reagan National Airport Fact Sheet*, October 2, 2001, available at http://www.whitehouse.gov/news/releases/2001/10/print/20011002-6.html.

## II. *Summary Judgment Standard*

This Court may sustain a motion for summary judgment and enter judgment in favor of the moving party only when there are no genuine issues of material fact in dispute. Rule 3:18; *Thurmond v. Prince William Prof'l Baseball Club, Inc.*, 265 Va. 59, 574 S.E.2d 246 (2003). Summary judgment is a "drastic remedy" which gives trial courts the authority to end litigation at an early stage as a matter of law, but "it does not substitute a new method of trial where an issue of fact exists." *Turner v. Lotts*, 244 Va. 554, 556, 422 S.E.2d 765, 766 (1992) *citing Leslie v. Nitz*, 212 Va. 480, 481, 184 S.E.2d 755, 756 (1971). Therefore, when reviewing the record, the Court accepts "those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Dudas v. Glenwood Golf Club, Inc.*, 261 Va. 133, 136, 540 S.E.2d 129, 130-31 (2001), *quoting Dickerson v. Fatehi*, 253 Va. 324, 327, 484 S.E.2d 880, 882 (1997).

When the Court is presented with cross-motions for summary judgment, as in this case, the nature of the filings do not themselves "resolve the question whether material facts remain genuinely in dispute." *Town of Ashland v. Ashland Inv. Co.*, 235 Va. 150, 154, 366 S.E.2d 100, 103 (1988). The Court's "duty to ascertain whether facts remain in dispute or whether there are sufficient facts to decide the question presented is not obviated by cross-motions for summary judgment." *Central Nat. Ins. v. Virginia Farm Bur. Ins.*, 222 Va. 353, 356, 282 S.E.2d 4, 6 (1981).

Once it is established that there are no material facts genuinely in dispute, the Court must determine whether the "moving party is entitled to judgment as a matter of law." *Leeman v. Troutman Builds, Inc.*, 260 Va. 202, 206, 530 S.E.2d 909, 911 (2000).

## III. *Issues Presented*

PMA's motion for summary judgment presents the following issues:

1. Whether the civil authority orders upon which US Airways bases its business interruption claim are a peril covered under the Policy;

2. Whether US Airways can claim a loss of market share under the Policy;

3. Whether US Airways' claim should be barred for failure to submit a proof of loss for all the components of their claim; and

4. Whether US Airways can maintain a claim against PMA for breach of the covenant of good faith and fair dealings under Virginia law.

US Airways' motion for partial summary judgment presents one issue:

1. Whether proceeds payable to US Airways under the Policy should be offset by compensation received under the Air Transportation Safety and System Stabilization Act.

## IV. *Analysis*

The Court will first examine the issues raised in PMA's motion for summary judgment, followed by an examination of the issue presented in US Airways' cross-motion for partial summary judgment.

### A. *PMA's Motion for Summary Judgment*

#### 1. *Coverage Under the Terms of the Policy*

PMA's motion for summary judgment asserts that US Airways' business interruption caused by the FAA's ground halt order of September 11, 2001, is not covered under the terms of the Policy.

US Airways bases its claim for coverage upon the civil or military authority provision in Policy. The Policy's "Interruption by Civil or Military Authority" provision provides coverage where, "as a direct result of a peril insured against, access to real or personal property is prohibited by order of civil or military authority." Policy § 7(F)(5). The Policy also defines peril insured against as "all risk of direct physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments." Policy § 8.

PMA summarizes its position as follows:

> US Airways' claim for such business interruption damages necessarily must fail because US Airways cannot demonstrate, as it must under the pertinent parts of the [Policy], that the order grounding flights, from which US Airways' claimed damages purportedly flow, was because of a peril covered under the [Policy]. Rather, the grounding was a precautionary measure taken to prevent property damage and injury *that had not yet occurred.* Precautionary measures, however, are not covered perils.

PMA Mem. in Supp. of Summ. J. at 8.

US Airways counters that the plain language of the Policy provides for coverage because, as a result of civil authority intervention, a loss was sustained due to business interruption. Further, the Policy does not specify

that the *insured's* property must be damaged to serve as the predicate to intervention by a civil authority. US Airways asserts it "suffered a direct, physical 'loss' of all of its airport facilities and its abilities to serve its customers by being denied access by civil authorities," and that damage alone is sufficient under the terms of the policy. US Airways Mem. in Opp'n to Summ. J. at 6.

PMA argues that, in order to recover under the Policy, actual damage to US Airways' property is required.[6] To that end, PMA relies on several cases from other jurisdictions which have found that, in order for an insured to recover under a civil authority provision similar to the provision in the Policy, the insured's property must be damaged causing the issuance of an interruption by a civil authority. However, those cases are distinguishable from the instant case.

In *City of Chicago v. Factory Mutual Ins. Co.*, 2004 U.S. Dist. LEXIS 4266 (N.D. Ill. 2004), the court granted summary judgment in favor of Factory Mutual Insurance ruling that it was not liable for damages under a business interruption policy with the City of Chicago stemming from the closure of three airports in Chicago after the attacks of September 11, 2001. Chicago claimed that the FAA's ground halt order caused direct damages under the policy by interrupting the operations of the three airports between September 11 and September 14, 2001. The court found that the Ingress/Egress provision of the policy, relied upon by the city, provided coverage for "business interruptions due to the prevention of ingress to or egress from the city's airports, provided that the prevention is the result of direct physical damage to the property that is at or within 1,000 feet of the airport premises." *Id.* at * 4. The court held that since the FAA ground halt order was not issued due to actual damages on the premises or within 1,000 feet of any of the airports, the city could not recover under the policy.

The policy in *City of Chicago* is noteworthy for several reasons. First, the policy specifically stated that the property which was damaged must be on or within 1,000 feet of the insured premises. Second, the policy had language that specifically stated " 'whether or not the premises or property of the insured shall have been damaged' [which] presupposes a situation in which ingress and egress are prevented due to a physical damage [of property which is not the insured's] within 1,000 feet of the airport premises, but not on the premises themselves." *Id.*

---

[6] There is a claim of actual loss of US Airways property. US Airways has asserted that a ticket office in the World Trade Center was destroyed; however, this loss appears to not have been included in US Airways' proof of loss. For the purposes of this motion for summary judgment, the Court will only consider losses stemming from interruption of business.

The specificity of the policy in *City of Chicago* makes the ruling in that case inapposite to the matter before the Court. Unlike the policy in *City of Chicago*, the Policy in this case does not provide specificity in its terms. Rather, the Policy only uses the terms "direct" and "property" without any definitions or references to what property must be damaged or where the loss must have occurred prior to civil authority intervention.

The other cases relied upon by PMA also make specific references to the property that must be damaged in order to recover. In *Assurance Co. of Am. v. BBB Serv. Co.*, 259 Ga. App. 54, 576 S.E.2d 38 (2002), the policy stated that action taken by a civil authority in response to damage to property other than the covered premises was recoverable. In *Syufy Enter., Inc. v. Home Ins. Co.*, 1995 U.S. Dist. LEXIS 3771 (N.D. Cal. 1995), the policy stated that coverage would be extended when "damage to or destruction of property adjacent to the premises [covered]" was the cause of the civil authority intervention.

Since the parties disagree on the interpretation of the terms of the Policy as to civil authority intervention, it is the Court's duty to examine the Policy to determine whether the terms are in fact clear and unambiguous. If the terms are not clear, it may be necessary, at trial, to hear parol evidence to ascertain the true meaning of the agreement between the parties.

It is settled law in Virginia that courts "interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words that have been used in the documents." *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993). "When the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction, rather, they give the language its plain and ordinary meaning and enforce the policy as written." *Partnership Umbrella, Inc. v. Federal Ins. Co.*, 260 Va. 123, 133, 530 S.E.2d 154, 160 (2000).

Terms in an insurance policy cannot be interpreted in a vacuum; "each component of an insurance contract 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein'." *Transcontinental Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 512, 551 S.E.2d 313, 318 (2001), *citing Suggs v. Life Ins. Co. of Va.*, 207 Va. 7, 11, 147 S.E.2d 707, 710 (1966). However, courts are not at liberty to search for the meaning of the agreement beyond the plain terms of the policy. *Monticello Ins. Co. v. Baecher*, 252 Va. 347, 477 S.E.2d 490 (1996). The Supreme Court has held that, if a court finds a contract to lack clarity, the "court should resort to parol evidence to ascertain the true intention of the parties." *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995).

The Policy here is a complete and binding agreement between the parties which is capable of interpretation on its face. Examining the Policy, the Court finds that the terms of the Policy are clear and unambiguous. Damage to the physical property of US Airways is not a condition precedent to recovery for business interruption. The Court concludes that a jury could find that coverage applied under the civil or military intervention provision.[7]

There is no basis in the plain language of the Policy which would lead the Court to conclude that the loss is not covered under the Civil and Military Interruption provision of the Policy. PMA's contention that the Policy requires damage to US Airways' property prior to a civil authority intervention is not a plausible interpretation of the Policy. There is nothing in the Policy that requires that the catalyst for any civil or military intervention be damage to US Airways' property.[8]

Based upon the limited question before the Court on this issue, the Court finds that summary judgment is not appropriate at this time. It is therefore the ruling of the Court that PMA's motion for summary judgment is denied on the issue of coverage.

## 2. Loss of Market Share

The next issue before the Court is whether US Airways can recover damages under the Policy for loss of market share as a result of business interruption. The Policy specifically states that "loss of market" is excluded from coverage. Policy § 9(E). US Airways claims that, since "loss of market" is not defined in the policy, the term is ambiguous and summary judgment is not appropriate.

PMA cites cases from other jurisdiction which have defined "loss of market," but this Court need not adopt another jurisdiction's interpretation of other policies when the plain meaning of the words are sufficient to resolve the controversy. See Monticello Ins. Co. v. Baecher, 252 Va. 347, 477 S.E.2d 490 (1996).

---

[7] The Court has only been asked to determine whether, as a matter of law, PMA is entitled to judgment that US Airways' loss is not covered under the Policy. Since US Airways has not filed a motion for summary judgment on this coverage issue, the Court will not rule on whether the loss herein is covered by the Policy.

[8] For example, if another airline's aircraft causes damage to a runway which required the FAA to close Reagan National Airport for several days, under PMA's interpretation, US Airways could not recover under the policy because the damage was not caused to US Airways' property. This proposition is counter-intuitive and would undermine the purpose of business interruption insurance.

In Virginia, policy exclusions will be construed against the insurer and in favor of the insured. *Transcontinental Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 551 S.E.2d 313 (2001). If language on the face of the policy can be "understood in more than one way or when such language refers to two or more things at the same time," the court will consider the language to be ambiguous. *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 263 Va. 52, 55-56, 556 S.E.2d 758, 760 (2002). To that end, if the language is ambiguous, the policy will be interpreted in a manner that provides for coverage. *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 260 Va. 77, 532 S.E.2d 325 (2000).

The exclusionary language of "loss of market" in this Policy is not ambiguous. When looking at the Policy as a whole, it is clear it only contemplates actual damages sustained by the insured as a result of business interruption.

The Policy specifically states that only actual loss will be covered and the express terms define how losses due to business interruption will be calculated.

> If such loss occurs (due to business interruption) during the term of this policy, it shall be adjusted on the basis of ACTUAL LOSS SUSTAINED by the Insured, consisting of the net profit which is thereby prevented from being earned and of all charges and expenses, including ordinary payroll, only to the extent that these must necessarily continue during the interruption of business and only to the extent to which such charges and expenses would have been earned had no loss occurred.

Policy § 7(B)(2).

This provision makes no mention of market share. Additionally, in the following section, when addressing the issues of research and development, the Policy limits recovery to "the actual loss sustained of the continuing fixed charges and expenses, including ordinary payroll, directly attributable to such research and development." Policy § 7(B)(2 [*sic*]). The Policy does not contemplate loss of market due to destruction of research and development.

The interpretation of an insurance policy is a question of law. *Lower Chesapeake Assocs.*, 260 Va. at 88, 532 S.E.2d at 331. As a matter of law, it is clear from the express terms of the Policy that the parties did not intend to provide coverage for loss of market share. Accordingly, PMA's motion for summary judgment is granted as to this issue.

### 3. *Proof of Loss*

The third issue presented in PMA's motion for summary judgment is whether US Airways can maintain this action since it did not produce a facially sufficient proof of loss for its claim.

PMA's argument is that US Airways did not claim damages to its subsidiaries or provide sufficient details of the destruction of any US Airways property within its proof of loss. As a result, PMA asserts that this litigation is not ripe, as the investigation under the Policy is still pending and US Airways' claims should be dismissed.

The provisions of the Policy require the following:

> 28. *Notice of Loss*
>
> As soon as practicable after any loss or damage occurring under this policy is known to the Insured's home office insurance department, the Insured shall report such loss or damage with full particulars to Aon Risk Services, Inc., of IL., 123 N. Wacker Drive, Chicago, IL. 60606, for transmission to this Company.

> 29. *Proof of Loss*
>
> It shall be necessary for the Insured to render a signed and sworn proof of loss to the Company or its appointed representative stating: the place, time, and cause of the loss, damage, or expense; the interest of the Insured and of all others; the value of the property involved in the loss; and the amount of loss, damage, or expense.

Policy §§ 28 and 29.

The parties agree that, on or about July 30, 2002, US Airways submitted a proof of loss for this claim to PMA. The proof of loss stated that US Airways claimed losses due to business interruption as a result of the closure of Reagan National Airport totaling $51,569,263. Furthermore, US Airways noted that the loss figure did not include additional losses attributable to its subsidiaries.

US Airways takes the position that, since the claimed loss exceeds the policy limit by two fold, even without the subsidiaries' losses, it was not necessary to extract a specific calculation of loss other than the one provided. Further, US Airways argues that PMA had notice of its claim and, since PMA did act upon the claim, it was necessary to file this action to avoid the bar of the statute of limitations.[9]

---

[9] There is a conflict in the evidence to determine whether PMA denied US Airways claim. PMA has asserted that US Airways has not provided a sufficient basis for a thorough

The question before the Court is whether US Airways' cause of action is barred for failure to produce a valid proof of loss under the terms of the Policy. "If an insurance policy makes the furnishing of a proof of loss a condition precedent to an action upon it, performance or waiver of it must be shown before a recovery can be had." *Aetna Cas. & Sur. Co. v. Harris*, 218 Va. 571, 578, 239 S.E.2d 84, 88 (1977). The burden is placed upon the insured to prove by a preponderance of the evidence that "the necessary requirements of [the policy] as to proof of loss or the waiver of such compliance on the part of the [insurance] company" have been established. *Id.* If US Airways cannot meet this burden, PMA will not be liable under the policy.

It is accepted that, where an insurance company "after defective or incomplete proofs are secured, denies liability, no further proofs need be furnished" by the insured. *Seaboard Fire & Marine Ins. Co of N.Y. v. Hurst*, 186 Va. 21, 26, 41 S.E.2d 495, 497 (1947). "The general rule supported by the weight of authority is that, if the insurance company denies liability for a loss and refuses to pay for that reason, and not for the reason that there has been no proof of loss filed by the claimant, it waives the right to insist on the filing of the proof of loss." *Id.*

It is clear that "on July 30, 2002, US Airways, Inc., submitted its 'Sworn Statement in Proof of Loss' " to PMA. PMA Mem. in Supp. of Summ. J. at 3. Furthermore, the proof of loss sets forth an exact amount of damages, in excess of the Policy limits. It is clear that PMA was given actual notice of the nature of US Airways' claim by the proof of loss filed on July 30, 2002.

Since US Airways has filed a proof of loss and PMA was aware of the claim and, further, since PMA's pleadings in this case state coverage is denied, PMA's motion for summary judgment on this issue is denied.

## 4. *Covenant of Good Faith and Fair Dealing*

The final issue raised in PMA's motion for summary judgment is whether US Airways can maintain a cause of action for bad faith.

PMA asserts that Virginia does not recognize the tort of insurer bad faith. *See Atlantic Permanent Fed. Sav. & Loan Assoc. v. American Cas. Co.*, 670 F. Supp. 168 (E.D. Va. 1986). The Supreme Court of Virginia has not ruled directly on this issue; however, several Virginia circuit courts have reached the same conclusion as the federal courts. *See generally Sentry Ins. v. United*

---

investigation of the claim; so, as of now, the claim is still pending. However, in its Grounds of Defense to US Airways Amended Motion for Judgment, PMA does state in one of their affirmative defenses that coverage "is denied." PMA Am. Answer at Defs. ¶ 11.

*States Fidelity & Guar. Co.*, 51 Va. Cir. 418 (City of Richmond 2000); *Coker v. State Farm Fire & Cas. Co.*, 45 Va. Cir. 510 (Fairfax County 1998) (ruling on other grounds).

In opposition, US Airways relies on Virginia Code § 38.2-209. Under § 38.2-209, an insured may seek attorney's fees and costs from an insurer when it is proven that the insurer acted in bad faith by denying coverage under the policy. Va. Code Ann. § 32.8-209 (1950).

The current posture of PMA's challenge presents a novel issue to the Court. PMA has filed a demurrer to US Airways' Amended Motion for Judgment, but seeks to dismiss this claim with the instant motion for summary judgment. While a demurrer tests the legal sufficiency of a claim as pleaded, summary judgment looks at the record and determines whether relief should be awarded as a matter of law. *See CaterCorp v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993), *compared to Klaiber v. Freemason Assoc., Inc.*, 266 Va. 478, 587 S.E.2d 555 (2003).

A review of US Airways' Amended Motion for Judgment demonstrates that some relief is sought under § 38.2-209, namely attorneys' fees and costs. Am. Mot. for J. at ¶ 52(d). Under § 38.2-209, an insured may seek costs and fees against an insurer for bad faith. *Federal Sav. & Loan Ass'n v. American Cas. Co.*, 670 F. Supp. 168 (E.D. Va. 1986).

The Supreme Court of Virginia has held that, under § 38.2-209, "courts should apply a reasonableness standard" which "would require consideration of such questions as whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim. . . ." *Cuna Mut. Ins. Soc'y v. Norman*, 237 Va. 33, 38, 375 S.E.2d 724, 727 (1989) (the Court was interpreting the former Virginia Code § 38.1-32.1, now § 38.2-209).

The statute does not create a separate cause of action; rather, any claim under the statute must stem from a suit that already exists. *Salomon v. Transamerica Occidental Life Ins. Co.*, 801 F.2d 659 (4th Cir. 1986). Therefore, US Airways may rely on § 38.2-209 for recovery of costs and ·fees, but it cannot *in this current litigation*, claim a wholly separate cause of action for bad faith under the policy.

The rule in Virginia is that an insured may recover against an insurer only after a judgment has been entered against the insurer for failure to settle the claim. *Horace Mann Ins. Co. v. GEICO*, 231 Va. 426, 344 S.E.2d 906 (1986). "The gravamen of such a claim is that the insurer's failure to settle within its policy limits results in a judgment against the insured in excess of those limits." *Sentry Ins.*, 51 Va. Cir. at 419.

In effect, a judgment against the insurer acts as a condition precedent to any claim of bad faith in Virginia. As a result, US Airways could not present any evidence at this trial that would merit a finding of bad faith. Therefore, PMA's motion for summary judgment on this issue is granted, and this count will be dismissed without prejudice as premature.

## B. *US Airways' Motion for Partial Summary Judgment*

The sole issue presented by US Airways' motion for summary judgment is whether proceeds received under the Air Transportation Safety and System Stabilization Act ("Stabilization Act") should offset any compensation received under the Policy with PMA.

The Policy provides compensation to the insured for "actual loss sustained ... consisting of net profit which is thereby prevented from being earned. . . ." Policy § 7(B)(2). Furthermore, "all salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this policy, shall reduce the loss accordingly." Policy § 24.

PMA has asserted the following defenses which are the subject of US Airways' motion for partial summary judgment:

> 10. US Air's recovery under the Caliber One policy, if any, is limited to its actual loss sustained in excess of amounts received from the federal government pursuant to the Air Transportation Safety and System Stabilization Act. . . .
>
> 12. To the extent Plaintiffs' claim is covered under the Caliber One policy's "civil authority" clause, which is denied, coverage is limited to loss incurred during a 30-day period, subject to the limit of liability in the policy and set-off for amounts received by Plaintiffs under the Air Transportation Safety and System Stabilization Act and/or from any other source.

PMA Am. Answer at Defs. ¶¶ 10 & 12.

It is PMA's position that the proceeds received by US Airways as a result of the Stabilization Act fall under the salvage provisions in § 24 of the Policy and should act as an offset to any recovery. US Airways argues that Congress did not intend for the Stabilization Act to offset any insurance proceeds available to commercial airlines; rather, the Stabilization Act was a federal subsidy to provide market stabilization after September 11th. Accordingly, US Airways seeks summary judgment dismissing PMA's claims of off-set under the Stabilization Act.

Since the term "payment" is not defined in the Policy, this Court will give the term its ordinary meaning. *State Farm Mut. Auto. Ins. Co. v. Bowers*, 255 Va. 581, 500 S.E.2d 212 (1998). If the court finds two equally fair interpretations, the one which permits a greater indemnity will prevail because "indemnity is the ultimate object of insurance." *Virginia Farm Bureau v. Jerrell*, 236 Va. 261, 268, 373 S.E.2d 913, 917 (1988), *quoting State Farm v. Manojlovic*, 215 Va. 382, 384, 209 S.E.2d 914, 916 (1974).

Payment is defined as "the fulfillment of a promise, or the performance of an agreement." *Black's Law Dictionary* at 1129 (6th Ed. 1990). Under this definition, it would appear that "payments" as defined in § 24 of the Policy do not contemplate proceeds from federal programs. On this finding alone, the Court could grant summary judgment in favor of US Airways. However, the issue of double recovery could render PMA's defenses valid.

PMA asserts that, if it cannot maintain that defense under the Stabilization Act, US Airways will receive a windfall. US Airways contends that any compensation for loss from the policy has already been accounted for in its filings to the federal government. As a result, the issue is whether the Stabilization Act produces a situation where US Airways would recover twice for the same loss.

The Congressional intent behind the Act was not to supplant the role of insurers in compensating airlines for interruptions caused by September 11th. The Department of Transportation, addressing the purpose of the Stabilization Act, has stated:

> It is our view that Congress intended the compensation payments to serve as a stabilizing force for individual air carriers and for the industry. The purpose of the payments was to mitigate or prevent losses as a way of preventing bankruptcies, massive service disruptions, and additional layoffs.

Procedures for Compensation of Air Carriers, 67 Fed. Reg. 54063 (2002).

Additionally, the Stabilization Act requires carriers to disclose any payments of business interruption insurance in their claim to the federal government. The regulations state:

> The actual losses you report must be net losses, before taxes, taking into account savings from such items as reductions in passenger and cargo handling costs, fuel consumption, land fees, revenue/traffic-related expenses, and savings of other costs due to the ground stop

and subsequent schedule/capacity/staff reductions, as well as proceeds from business recovery insurance or other insurance payments.

14 C.F.R. 330.27(d)(4).

It is firmly rooted in Virginia law that a party cannot recover more than the party actually lost as a result of a breach of contract. *Orebaugh v. Antonious,* 190 Va. 829, 58 S.E.2d 873 (1950). Based upon the procedures set forth by the federal government, US Airways must offset any insurance proceeds from any claim under the Stabilization Act, but that does not require US Airways to offset the federal payment from its claim for coverage under the business interruption Policy.

Therefore, the Court grants the motion for partial summary judgment.

## V. *Conclusion*

Accordingly, for the reasons stated herein, US Airways motion for partial summary judgment is granted; PMA's motion for summary judgment is granted in part and denied in part.